Ameer Benno, Esq.
Shandell, Blitz, Blitz & Ashley, LLP
150 Broadway, 14th Floor
New York, NY 10038
(t)(212) 513-1300
(f)(212) 385-1916
abenno@shandellblitz.com

## UNITED STATES DISTRICT COURT
### Southern District of New York

RECEIVED
JAN 22 2009
U.S.D.C. S.D. N.Y.
CASHIERS

|  |  |
|---|---|
| KENNETH BAILEY,<br><br>Plaintiff(s),<br><br>-against-<br><br>GEORGE PATAKI, EILEEN CONSILVIO, GLENN S. GOORD, SHARON CARPINELLO, MICHAEL GIAMBRUNO, JAMES CONWAY, PAUL ANNETTS, EMILIA RUTIGLIANO, PRABHAKAR GUMBULA, OLUSEGUN BELLO, and ALLAN WELLS,<br><br>Defendant(s). | Civil Action No.:<br>08 Civ 8563 (JSR)<br><br>**AMENDED COMPLAINT FOR DAMAGES (42 USC § 1983)**<br><br>**A JURY TRIAL IS DEMANDED** |

**KENNETH BAILEY** ("Plaintiff"), by his attorneys, SHANDELL, BLITZ, BLITZ & ASHLEY, LLP, complaining of the defendants herein, respectfully shows to this Court, and alleges as follows:

## PRELIMINARY STATEMENT

1.         This is a civil rights action in which the plaintiff, Kenneth Bailey, seeks relief for the defendants' violations of his rights secured by, inter alia, the Civil Rights Act of 1871, 42 USC § 1983, and of rights secured by the Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States.

2.          The plaintiff seeks damages, both compensatory and punitive, an award of costs, interest and attorney's fees, and such other and further relief as this Court deems equitable and just.

3.          Between October 1993 and October 2005, plaintiff, who had been convicted of a sex offense, was incarcerated in the New York State prison system.  After twelve years behind bars, in the final days of his sentence, plaintiff was deprived of his freedom and civilly committed to an indefinite sentence in a state-run psychiatric facility.  Although the New York State Corrections Law requires that a specific procedure be followed when an inmate is to be confined in a psychiatric facility, those responsible for putting plaintiff there blatantly and deliberately ignored the prescriptions of that law and instead committed him by way of the far laxer procedures provided by the New York State Mental Hygiene Law's involuntary civil commitment statute.

4.          The defendant GEORGE PATAKI ("Pataki"), the former Governor of New York State, the defendant EILEEN CONSILVIO ("Consilvio"), the former Executive Director of Manhattan Psychiatric Center and Kirby Forensic Psychiatric Center, the defendant GLENN GOORD ("Goord"), the former Commissioner of the New York State Department of Corrections, the defendant SHARON CARPINELLO ("Carpinello"), the former Commissioner of the New York State Office of Mental Health, the defendant MICHAEL GIAMBRUNO

("Giambruno"), the former Superintendent of Wyoming Correctional Facility, the defendant JAMES CONWAY ("Conway"), the Superintendent of Attica Correctional Facility, the defendant PAUL ANNETTS ("Annetts"), the former Superintendent of Downstate Correctional Facility, the defendant EMILIA RUTIGLIANO ("Rutigliano"), the mental hygiene examiner, who evaluated plaintiff at Attica Correctional Facility, pursuant to New York State Mental Hygiene Law Article 9 for purposes of civilly committing him to a psychiatric facility, the defendant PRABHAKAR GUMBULA ("Gumbula"), the mental hygiene examiner, who evaluated plaintiff at Attica Correctional Facility, pursuant to New York State Mental Hygiene Law Article 9 for purposes of civilly committing him to a psychiatric facility, the defendant OLUSEGUN BELLO ("Bello"), the psychiatrist who confirmed plaintiff's need for involuntary care and treatment, and the defendant ALLAN WELLS ("Wells"), the physician who examined plaintiff in support of the retention order application, all of whom participated in the improper examination, evaluation, commitment, confinement, and detention of plaintiff in a psychiatric facility following the expiration of plaintiff's term of imprisonment in state correctional facilities, intentionally played a pivotal role in the deprivation of plaintiff's civil rights, and ultimately, his confinement in a New York State psychiatric facility, where he has languished for the past three years.

5.          But for the defendants' unconstitutional conduct, plaintiff would be a free man. This action seeks compensation for the injuries endured by plaintiff occasioned by defendants' willfully malicious and/or deliberately indifferent acts.

6.          Defendants, their agents, servants and/or employees, acting in concert, under color of state laws, intentionally and willfully subjected plaintiff to, inter alia, detention, malicious abuse of process, violation of plaintiff's right to due process, negligent and intentional infliction of emotional distress, violation of the civil rights of plaintiff, negligent infliction of emotional distress, assault, battery, and personal injuries to plaintiff.

## JURISDICTION AND VENUE

7.          This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367(a), in that it alleges claims for relief arising under 42 U.S.C. § 1983, the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, and under the Constitution, statutes and common law of the State of New York.

8.          Additionally, the Court has pendant jurisdiction, pendant party jurisdiction and supplementary jurisdiction of the state and common law claims asserted herein pursuant to 28 U.S.C. § 1367 because such claims form part of the

same case or controversy over which this Court has original subject matter jurisdiction.

9.　　　　　Venue is laid within the United States District Court for the Southern District of New York and is proper pursuant 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within the boundaries of this district or, in the alternative, the defendants are subject to personal jurisdiction in this district.

## THE PARTIES

10.　　　　　Plaintiff is a resident of the State of New York and at all times relevant to the allegations of this complaint was a citizen of the United States.

11.　　　　　At all times relevant to this action, defendant GEORGE PATAKI was the Governor of the State of New York.  This defendant was responsible for the creation and enforcement of policy decision to use the Mental Hygiene Law Article 9 civil commitment statute to confine plaintiff in a New York State Office of Mental Health (hereinafter "OMH") psychiatric facility while he was still incarcerated in a Department of Correctional Services (hereinafter "DOCS") facility.  He is further responsible because of his authorization, condoning, and ratification of the acts of co-defendants.  As such, defendant Pataki is or was an aider and abettor and/or co-conspirator of defendants Consilvio, Goord, Carpinello, Giambruno, Conway,

Annetts, Rutigliano, Gumbula, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in his personal capacity.

12.      At all times relevant to this action, defendant EILEEN CONSILVIO was the Executive Director of Manhattan Psychiatric Center and Kirby Forensic Psychiatric Center.  At all relevant times, this defendant was acting as the agent, servant, and employee of the New York State Office of Mental Health.   This defendant was responsible for the training, supervision, and conduct of all employees at Manhattan Psychiatric Center and Kirby Forensic Psychiatric Center.  As such, defendant Consilvio is or was an aider and abettor and/or co-conspirator of defendants Pataki, Goord, Carpinello, Giambruno, Conway, Annetts, Rutigliano, Gumbula, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in her personal capacity.

13.      At all times relevant to this action, the defendant GLENN S. GOORD was the Commissioner of the New York State Department of Corrections. This defendant was responsible for the training, supervision, and conduct of all Corrections employees.   This defendant is also responsible for authorizing, condoning, and ratifying of the acts of his/her employees, agents, and staff.  As such,

defendant Goord is or was an aider and abettor and/or co-conspirator of defendants Pataki, Consilvio, Carpinello, Giambruno, Conway, Annetts, Rutigliano, Gumbula, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in his personal capacity.

14.        At all times relevant to this action, the defendant SHARON CARPINELLO was the Commissioner of the New York State Office of Mental Health. This defendant was responsible for the training, supervision, and conduct of all OMH employees. This defendant is also responsible for authorizing, condoning, and ratifying of the acts of his/her employees, agents, and staff. As such, defendant Carpinello is or was an aider and abettor and/or co-conspirator of defendants Pataki, Consilvio, Goord, Giambruno, Conway, Annetts, Rutigliano, Gumbula, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in her personal capacity.

15.        At all times relevant to this action, the defendant MICHAEL GIAMBRUNO was the Superintendent of Wyoming Correctional Facility. This defendant was responsible for the training, supervision, and conduct of all Wyoming Correctional Facility employees. This defendant is also responsible for authorizing, condoning, and ratifying the acts of his/her employees, agents, and staff. As such,

defendant Giambruno is or was an aider and abettor and/or co-conspirator of defendants Pataki, Consilvio, Goord, Carpinello, Conway, Annetts, Rutigliano, Gumbula, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in his personal capacity.

16.      At all times relevant to this action, the defendant JAMES CONWAY was the Superintendent of Attica Correctional Facility, who applied for plaintiff's commitment pursuant to § 9.27 of the Mental Hygiene Law.   This defendant was responsible for the training, supervision, and conduct of all Attica Correctional Facility employees.  This defendant is also responsible for authorizing, condoning, and ratifying the acts of his/her employees, agents, and staff.  As such, defendant Conway is or was an aider and abettor and/or co-conspirator of defendants Pataki, Consilvio, Goord, Carpinello, Giambruno, Annetts, Rutigliano, Gumbula, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in his personal capacity.

17.      At all times relevant to this action, the defendant PAUL ANNETTS was the Superintendent of Downstate Correctional Facility.   This defendant was responsible for the training, supervision, and conduct of all Downstate Correctional Facility employees.  This defendant is also responsible for authorizing,

condoning, and ratifying the acts of his/her employees, agents, and staff. As such, defendant Annetts is or was an aider and abettor and/or co-conspirator of defendants Pataki, Consilvio, Goord, Carpinello, Giambruno, Conway, Rutigliano, Gumbula, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in his personal capacity.

18.     At all times relevant to this action, the defendant EMILIA RUTIGLIANO was a mental hygiene examiner employed to examine plaintiff prior to his civil commitment pursuant to Article 9 of the Mental Hygiene Law, who certified plaintiff's mental illness and need for involuntary care/treatment. As such, defendant Rutigliano is or was an aider, abettor, and/or co-conspirator of defendants Pataki, Consilvio, Goord, Carpinello, Giambruno, Conway, Annetts, Gumbula, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in his/her personal capacity.

19.     At all times relevant to this action, the defendant PRABHAKAR GUMBULA was a mental hygiene examiner employed to examine plaintiff prior to his civil commitment pursuant to Article 9 of the Mental Hygiene Law, who certified plaintiff's mental illness and need for involuntary care/treatment. As such, defendant Gumbula is or was an aider, abettor, and/or co-conspirator of defendants Pataki,

Consilvio, Goord, Carpinello, Giambruno, Conway, Annetts, Rutigliano, Bello and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff.  This defendant is sued in his/her personal capacity.

20.     At all times relevant to this action, the defendant OLUSEGUN BELLO was the physician employed to examine plaintiff upon his arrival at the receiving psychiatric facility pursuant to Article 9 of the Mental Hygiene Law, who confirmed plaintiff's need for involuntary commitment and thereafter admitted him at the receiving psychiatric facility.  As such, defendant Bello is or was an aider, abettor, and/or co-conspirator of defendants Pataki, Consilvio, Goord, Carpinello, Giambruno, Conway, Annetts, Rutigliano, Gumbula, and Wells in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in his/her personal capacity.

21.     At all times relevant to this action, the defendant ALLAN WELLS was the physician employed to examine plaintiff, approximately 60 days following his civil commitment pursuant to Article 9 of the Mental Hygiene Law, who signed the physician's confirmation of need for involuntary civil retention for care and treatment in support of the retention order application.  As such, defendant Wells is or was an aider, abettor, and/or co-conspirator of defendants Pataki,

Consilvio, Goord, Carpinello, Giambruno, Conway, Annetts, Rutigliano, Gumbula, and Bello in the acts, omissions, conspiracies and other wrongful conduct described herein, all of whom knew or should have known that their actions would cause legal injury to plaintiff. This defendant is sued in his personal capacity.

22.　　　At all relevant times, and in all their actions, all the defendants were acting under color of law, in the course and scope of their employment, and pursuant to their authority.

## STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION

### Background

23.　　　By a vote of 5 to 4 in 1997, the United States Supreme Court ruled that states could employ civil laws when criminal ones were exhausted and involuntarily confine "mentally abnormal" people deemed likely to commit a violent sex crime.

24.　　　In 2005, frustrated for years by the State Assembly's refusal to pass a bill to lock up violent felony sex offenders in mental hospitals when their prison terms end, Governor Pataki implemented a policy intended to "push the envelope" and to accomplish the same end through Article 9 of the New York State Mental Hygiene Law.

25.        Section 402 of the Corrections Law provides that, absent an emergency basis for psychiatric admission, a prison superintendent must first apply to a court for the appointment of two examining physicians to conduct psychiatric examinations of the inmate. These physicians cannot be on the prison's staff.

26.        If those two physicians certify that the inmate is mentally ill and in need of psychiatric care/treatment, then the superintendent must petition the court for a commitment order.

27.        Notice of the petition must be served upon the inmate, his closest friend/relative, and Mental Hygiene Legal Service.

28.        The inmate is then entitled to request a hearing before a judge before the transfer to a psychiatric hospital is undertaken.

29.        Conversely, New York States Mental Hygiene Law § 9.27 authorizes involuntary hospitalization of non-incarcerated individuals who are: (i) mentally ill; (ii) in need of involuntary care and treatment; and (iii) present a danger to themselves or society.

30.        Civil commitment under this statute requires certification by two physicians of mental illness and need for involuntary care/treatment; submission by a statutorily designated person of an application for involuntary commitment based on that certification; and a confirmatory examination by a physician at the receiving psychiatric facility.

## The Post-Confinement Habeas

31.          Between September 23, 2005 and October 21, 2005, twelve convicted felony sex offenders were confined at the end of their prison terms at the Manhattan Psychiatric Center (hereinafter "MPC") pursuant to this directive.

32.          These inmates were confined to a segregated ward at MPC with additional staff and specialized security protocol. Plaintiff Kenneth Bailey was included in this group.

33.          The Deputy Director of Mental Hygiene Legal Services initiated a habeas corpus proceeding on behalf of these individuals seeking their immediate release.    Petitioners argued that since they had been undergoing a sentence of imprisonment at the time of their commitment to the psychiatric facility, it was illegal for the State to transfer them into the mental health system pursuant to Article 9 of the Mental Hygiene Law.  Rather, they asserted that the State was required to comply with the procedures set forth in Correction Law § 402, which governs the commitment of mentally ill prisoners to psychiatric hospitals.

34.          New York Supreme Court granted the petition and ordered the petitioners' conditional release, finding that the State's use of Article 9 of the Mental Hygiene Law deprived petitioners of the protections afforded to prisoners under the provisions of Corrections Law § 402, and that the Corrections Law, not the Mental

Hygiene Law, applied to these petitioners.  State ex rel. Harkavy ex rel. Does v. Consilvio, 10 Misc.3d 851 (Sup. Ct. N.Y. Co. 2005).

35.        The State appealed, and the Appellate Division reversed on the law.  It vacated the order for conditional release and dismissed the petition, concluding that Correction Law § 402 "applied only to persons undergoing a sentence of imprisonment, [and therefore] contemplate[d] return to a [Department of Corrections] facility."  State ex rel. Harkavy ex rel. Does v. Consilvio, 29 A.D.3d 221, 225 (1st Dept. 2006).  It determined that since the petitioners were not returning to the custody of the Department of Corrections but instead were scheduled to be released, that the State properly committed them under Mental Hygiene Law Article 9. Id.

36.        On further appeal, The New York State Court of Appeals reversed the holding of the Appellate Division.  In a decision, dated November 21, 2006, the Court of Appeals held that the State failed to use the proper procedural law to commit these inmates to the psychiatric facility.  Specifically, the Court concluded that it was unlawful for the State to use Article 9 to commit those individuals since they were still technically incarcerated at the time of their commitment; the State should have used Section 402 of the New York State Corrections Law.  State ex rel. Harkavy ex rel. Does v. Consilvio, 7 N.Y.3d 607 (2006).  The Court of Appeals stated:

"We agree with Supreme Court's assessment that 'the plain truth of the matter is that each of the petitioners were, in fact, imprisoned at the time of their civil commitment.' Two of the petitioners' applications for commitment were submitted on the date of their release and the remaining 10 petitioners' applications were submitted from one to four days prior to their release. The Appellate Division erroneously stated that "a few hours or days remaining in the sentence of these individuals as of the time of the application did not … render them persons undergoing a sentence of imprisonment.' Because all the preliminary paperwork and examinations were completed during the sentence, the Correction Law should have been followed.

\* \* \*

"[B]ecause inmates who are incarcerated do not pose an immediate threat to the community, there should be ample time to proceed under the Correction Law. Therefore … we believe that Correction Law § 402 is the appropriate method for evaluating an inmate for postrelease involuntary commitment to a mental facility." Id. at 613-14 (internal citations omitted).

37.    In a notable concurring opinion, Justice Smith declared:

"Petitioners had all been in prison for years before the State sought to commit them civilly. No sudden, unforeseen emergency required their confinement in a mental hospital. Since it cannot be said in this case that 'immediate action was necessary for the protection of society,' a strong argument can be made that petitioners were constitutionally entitled to a hearing before being deprived of the liberty that they would otherwise have obtained upon the completion of their prison terms. [ ] Correction Law § 402 provides for such a predeprivation hearing[.]" Id. at 615.

38.    Although the Court of Appeals did not immediately order the release of the petitioners, who were at that time no longer serving prison sentences, it

ordered that "those petitioners remaining in OMH custody be afforded an <u>immediate</u> retention hearing pursuant to Article 9 of the Mental Hygiene Law." <u>Id</u> at 614 (emphasis added).

## <u>Kenneth Bailey's Unlawful Commitment in MPC</u>

39.        Defendants, through the conduct described below, deliberately and maliciously subverted the authority and judgment of the justice system by intentionally abusing, without justification or excuse, an existing, yet inapplicable, civil statute – Article 9 of the New York State Mental Hygiene Law – to illegally extend plaintiff's term of incarceration beyond the sentence that was lawfully imposed upon him by the court for the crimes he committed fifteen years ago.

40.        Upon information and belief, in October 1993, plaintiff was arrested in New York State, County of Chemung for First Degree Sexual Abuse, a felony.

41.        Upon information and belief, in or about January 1994, plaintiff was indicted for First Degree Sodomy.  Plaintiff pled guilty to that charge and was sentenced on January 31, 1994 to an indeterminate prison term of from six to twelve years.

42.        Upon information and belief, plaintiff was scheduled to be released from state prison on October 7, 2005, after the completion of the full term of his sentence.

43.     Upon information and belief, plaintiff was informed by letter that he was to be transferred from Wyoming Correctional Facility, where he was being housed, to Attica Correctional Facility for a standard, pre-release examination.  He was instructed that he had ten days to send all his possessions home for intermediate safekeeping.

44.     Upon information and belief, the letter made no mention or reference to civil commitment in an Office of Mental Health facility (hereinafter, "OMH facility"), and plaintiff's counselor at Wyoming Correctional Facility told plaintiff not to worry, that this was standard protocol, and that plaintiff was going to be released.

45.     Upon information and belief, on September 30, 2005, plaintiff was transferred from Wyoming Correctional Facility to Attica Correctional Facility.

46.     Upon information and belief, plaintiff remained at Attica Correctional Facility for six days before he was evaluated.  During that time, no one mentioned anything to him about civil commitment.

47.     Upon information and belief, on or about the morning of October 3, 2005, plaintiff was escorted to the mental health clinic at Attica where he was examined by six individuals.  As it turned out, this examination was for the purpose of involuntary confinement to an OMH facility, and at least two of the individuals

conducting the evaluation were OMH physicians.  This evaluation lasted no more than fifteen minutes.

48.        Upon information and belief, based on this cursory evaluation, the physicians, defendants Rutigliano and Gumbula, certified, pursuant to Article 9 of the New York State Mental Hygiene Law, that plaintiff suffered from a mental illness and that without inpatient psychiatric treatment, he posed a high risk of recommitting sexual crimes if released into the community.  Conway, the Superintendent of Attica Correctional Facility, never applied to any court for the appointment of these two examining physicians.

49.        Upon information and belief, later that same day, plaintiff was again brought before the same group that had examined him that morning.  This time, the group did not ask plaintiff any questions, but instead informed him that he would be going to MPC for "further evaluation" that could last anywhere from a couple weeks to a couple years.  This meeting lasted no more than five minutes.

50.        Upon information and belief, plaintiff told the group that his fiancée was planning on picking him up from the prison on October 7, 2005, and plaintiff asked that someone call her and tell her this news.

51.        Upon information and belief, plaintiff later learned from his fiancée that when she spoke on the telephone with one of these individuals, she was told that plaintiff would be in MPC "indefinitely."  Upon information and belief,

when plaintiff's fiancée asked what that meant, she was told that it meant "for the rest of his life."

52.     Upon information and belief, on or about October 4, 2005, plaintiff was transferred from Attica Correctional Facility to Downstate Correctional Facility.

53.     Upon information and belief, defendant Conway, the prison Superintendent at Attica Correctional Facility, completed the application for plaintiff's involuntary commitment, pursuant to Mental Hygiene Law § 9.27.

54.     Upon information and belief, on October 7, 2005, the date that plaintiff's prison term expired, he was removed from his cell, handcuffed and shackled, and transported to MPC.

55.     Upon information and belief, when plaintiff arrived at MPC, he was evaluated by defendant Bello.   This psychiatrist also found involuntary commitment necessary.

56.     Thereafter, he was committed to MPC for an indefinite term pursuant to Article 9 of the New York State Mental Hygiene Law.  Medical staff at MPC and/or Kirby, including defendant Wells, found plaintiff's involuntary retention necessary and applied to the court for a retention order to keep plaintiff confined against his will in the psychiatric facility.

57.        Plaintiff was thereafter incarcerated against his will in MPC. Plaintiff has remained unlawfully confined against his will in MPC and Kirby Forensic Psychiatric Facility from that time up to and including the present. Upon information and belief, at no time was plaintiff ever afforded an Article 9 retention hearing.

58.        Plaintiff has remained unlawfully confined against his will in MPC and Kirby Forensic Psychiatric Facility from that time up to and including the present. He is not permitted to leave, and is kept in a segregated wing behind double locked doors. He is permitted only one hour of outdoor recreation a day in a yard that is encircled by two fences, one of which is topped with barbed wire. He is escorted everywhere he goes by OMH security personnel, and when he leaves the premises for a court appearance, he is placed in handcuffs affixed to a leather waist belt.

## Damages

59.        This action seeks damages on behalf of plaintiff for the period between October 7, 2005 and present. During that time, plaintiff was subjected to and did endure injuries to his person, and was subjected to and did endure extraordinary humiliation, emotional distress, and emotional pain and suffering.

60.        The conduct of defendants, who acted at all times under color of state law and within the scope of their employment and authority, directly and

proximately caused plaintiff serious injury, including but not limited to mental anguish, humiliation and embarrassment.

## FEDERAL THEORIES OF RECOVERY

61.        By the actions and omissions described above and incorporated by reference as if fully set forth herein, engaged in under color of state authority, the defendants conspired to interfere with and violate rights secured to the plaintiff by the Constitution of the United States in violation of 42 U.S.C. § 1985(3), including, but not limited to. The plaintiff's:

  a. Fifth and Fourteenth Amendment rights to due process of law;

  b. Fourteenth Amendment right to equal protection of the law;

  c. Fourth Amendment right to be free from unlawful search and seizure of his person.

62.        By the actions and omissions described above and incorporated by reference as if fully set forth herein, engaged in under color of state authority, the defendants deprived the plaintiff of rights secured to him by the Constitution of the United States in violation of 42 U.S.C. § 1983, including, but not limited to, the plaintiff's:

  a. Fifth and Fourteenth Amendment rights to due process of law;

  b. Fourteenth Amendment right to equal protection of the law;

   c.  Fourth Amendment right to be free from unlawful search and seizure of his person.

## STATE LAW THEORIES OF RECOVERY

63.      The acts and conduct alleged above and incorporated by reference as if fully set forth herein constitute actionable torts under the laws of the State of New York, including the tort of:

   a.  False arrest and imprisonment;

   b.  Assault and battery;

   c.  Abuse of process;

   d.  Denial of due process under the New York State Constitution;

   e.  Denial of equal protection under the New York State Constitution;

   f.  Negligence;

   g.  Gross negligence;

   h.  Negligent infliction of emotional distress;

   i.  Intentional infliction of emotional distress;

   j.  Prima facie tort.

WHEREFORE, plaintiff demands the following relief jointly and severally against each defendant:

    a.  Compensatory damages in the amount of ten million dollars ($10,000,000);

    b.  Punitive damages in an amount to be determined by a jury;

    c.  The convening of a jury to consider the merits of the claims herein;

    d.  Attorney's fees pursuant to 42 U.S.C. § 1988;

    e.  An award of plaintiff's costs of suit;

    f.  Such other further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interest of justice.

Dated:    New York, New York
             January 19, 2009

             Yours, etc.,

             SHANDELL, BLITZ, BLITZ & ASHLEY, LLP

             By: _____
                AMEER BENNO, Esq. [AB-1130]
             150 Broadway, 14th Floor
             New York, NY 10038
             Tel.:  (212) 513-1300

             For the Plaintiff

CIVIL ACTION NO.     08 CV 8563 (JSR)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KENNETH BAILEY,

Plaintiff(s),

- against -

GEORGE PATAKI, EILEEN CONSILVIO, GLENN S. GOORD, SHARON
CARPINELLO, MICHAEL GIAMBRUNO, JAMES CONWAY, PAUL ANNETTS,
EMILIA RUTIGLIANO, PRABHAKAR GUMBULA, OUSEGUN BELLO, and ALLAN
WELLS,

Defendant(s).

## AMENDED COMPLAINT FOR DAMAGES
### (42 USC § 1983)

**SHANDELL, BLITZ, BLITZ & ASHLEY, LLP**
Attorneys for Plaintiffs
Office and Post Office Address, Telephone
150 BROADWAY, 14TH FLOOR
NEW YORK, NEW YORK 10038
(212)513-1300

Signature Pursuant to Rule 130-1.1-a

Ameer Benno

To:

Attorney(s) for