```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
                                     :
KENNETH BAILEY,                      :
                                     :
             Plaintiff,              :        08 Civ. 8563 (JSR)
                                     :
             -v-                     :
                                     :
GEORGE PATAKI, et al.,               :
                                     :
             Defendants.             :
------------------------------------ x
------------------------------------ x
                                     :
GEORGE BROOKS,                       :
                                     :
             Plaintiff,              :
                                     :        08 Civ. 8665 (JSR)
             -v-                     :
                                     :
GEORGE PATAKI, et al.,               :
                                     :
             Defendants.             :
------------------------------------ x
------------------------------------ x
                                     :
LOUIS MASSEI,                        :
                                     :
             Plaintiff,              :        08 Civ. 8923 (JSR)
                                     :
             -v-                     :
                                     :
GEORGE PATAKI, et al.,               :
                                     :
             Defendants.             :
------------------------------------ x
------------------------------------ x
                                     :
JORGE BURGOS, JR.,                   :
                                     :
             Plaintiff,              :        08 Civ. 8924 (JSR)
                                     :
             -v-                     :
                                     :
GEORGE PATAKI, et al.,               :
                                     :
             Defendants.             :
------------------------------------ x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/20/09

```
------------------------------------ x
                                     :
ROBERT TROCCHIO,                     :
                                     :
              Plaintiff,             :        08 Civ. 8925 (JSR)
                                     :
              -v-                    :
                                     :
GEORGE PATAKI, et al.,               :
                                     :
              Defendants.            :
------------------------------------ x
------------------------------------ x
                                     :
ROBERT WARREN,                       :
                                     :
              Plaintiff,             :        08 Civ. 9609 (JSR)
                                     :
              -v-                    :
                                     :
GEORGE PATAKI, et al.,               :
                                     :
              Defendants.            :
------------------------------------ x
```

### OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

Article 9 of the New York Mental Hygiene Law provides for the involuntary psychiatric commitment of "any person alleged to be mentally ill and in need of involuntary care and treatment." N.Y. Mental Hyg. Law § 9.27. Plaintiffs, all convicted sex offenders, each individually allege that shortly before being released from prison, they were involuntarily committed to state-run psychiatric facilities based on their sex offender status. Plaintiffs contend that defendants' invocation of Article 9 to effectuate their transfer to these psychiatric facilities deprived them of the procedural

2

protections to which they were constitutionally entitled, and seek
damages under federal and state law.  Defendants moved pursuant to
Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' Complaints on the
basis of qualified immunity, or, in the alternative, for a stay
pending the resolution of certain pending state court proceedings.
On June 8, 2009, the Court denied defendants' motion.  This
Memorandum Order explains the reasons for that determination.

Article 9, which is applicable to persons generally who
develop mental illnesses requiring involuntary hospitalization,
permits involuntary psychiatric commitments "upon the certificates of
two examining physicians, accompanied by an application for the
admission of such person[s]."  N.Y. Mental Hyg. Law § 9.27(a).  Such
application must be made by someone with personal knowledge of the
individual in question, id. § 9.27(b), and must "contain a statement
of the facts upon which the allegation of mental illness and need for
care and treatment are based."  Id. § 9.27(c).  A confirmatory
examination is conducted by a doctor at the hospital upon the
patient's arrival, id. § 9.27(e), and, after the patient has been
hospitalized, he or she may request a judicial hearing on his or her
need for hospitalization.  Id. § 9.31.  Moreover, written notice of
the patient's involuntary admission must "be given forthwith to the
mental hygiene legal service," and written notice of the admission,
including a list of the patient's rights under Article 9, must be
given, within five days of the patient's admission, to (1) "the
nearest relative of the person alleged to be mentally ill, other than

3

the applicant, if there be any such person known to the director,"
and (2) "as many as three additional persons, if designated in
writing to receive such notice by the person so admitted."  Id. §
9.29.

Article 9 does not, however, require that the psychiatric
examination underlying a patient's admission be conducted by a court-
appointed independent physician, does not require pre-transfer notice
to the patient, to his friends or relatives, or to the Mental Hygiene
Legal Service, and does not afford the possibility of a pre-
commitment judicial hearing.  In light of these and other alleged
inadequacies, plaintiffs contend that defendants, in their invocation
of Article 9 to effectuate plaintiffs' transfer to state-run
psychiatric facilities, failed to afford plaintiffs adequate
procedural due process protections.

Against this background, defendants argue that they are
entitled to qualified immunity from suit because the procedures set
forth in Article 9 were constitutionally adequate to protect against
any alleged interference with plaintiffs' existing liberty interests,
and, to the extent that they were not adequate, any rights that were
violated in effectuating plaintiffs' transfer were not clearly
established at the time of plaintiffs' commitment.

In assessing the adequacy of the procedural protections
afforded by Article 9, this Court must determine whether an existing
liberty or property interest was interfered with by the state, Board
of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972), and,
if so, whether the procedures attendant upon that deprivation were

4

constitutionally sufficient.  Zinermon v. Burch, 494 U.S. 113, 126
(1990).  The existence of a liberty interest is plainly present,
since involuntary commitments to mental institutions entail "a
massive curtailment of liberty," Vitek v. Jones, 445 U.S. 480, 491
(1980) (citation omitted).  See Addington v. Texas, 441 U.S. 418, 425
(1979) ("civil commitment for any purpose constitutes a significant
deprivation of liberty that requires due process protection").

        As for interference with that interest, the Supreme Court in
Vitek considered whether the Due Process Clause "entitles a prisoner
. . . to certain procedural protections, including notice, an
adversary hearing, and provision of counsel, before he is transferred
involuntarily to a state mental hospital for treatment of a mental
disease or defect." 445 U.S. at 482.  The Court answered in the
affirmative, concluding that a convicted felon "is entitled to the
benefit of procedures appropriate in the circumstances before he is
found to have a mental disease and transferred to a mental hospital."
Id. at 493 (emphasis added).  In so holding, the Court emphasized
that "notice is essential to afford the prisoner an opportunity to
challenge the contemplated action and to understand the nature of
what is happening to him."  Id. at 496.  Included among the pre-
confinement procedures that the Court deemed "appropriate" were
written notice, a hearing at which evidence supporting the inmate's
transfer would be disclosed and at which the inmate would have an
opportunity to be heard and to present evidence opposing the
transfer, an independent decision-maker, a written statement by the
decision-maker of the reasons for the transfer, the assistance at the

5

hearing of competent assistance (though not necessarily an attorney), and written notice of the foregoing rights.  Id. at 494-97.

Here, all six plaintiffs allege that they were involuntarily transferred to state-run mental institutions based on the certification of doctors designated by the New York State Office of Mental Health and/or the New York Department of Correctional Services, instead of independent, court-appointed doctors.  See Bailey Amended Complaint for Damages ("Bailey Compl.") ¶¶ 47-49; Brooks Amended Complaint ("Brooks Compl.") ¶¶ 43-45; Burgos Amended Complaint for Damages ("Burgos Compl.") ¶¶ 47-50; Massei Amended Complaint for Damages ("Massei Compl.") ¶¶ 42-43; Trocchio Amended Complaint for Damages ("Trocchio Compl.") ¶¶ 44-46; Warren Complaint for Damages ("Warren Compl.") ¶¶ 48-49.  Plaintiffs Bailey, Burgos, Brooks, Massei, and Trocchio were never served with notice of a petition for their involuntary commitment, Bailey Compl. ¶¶ 43-44, 46;  Brooks Compl. ¶ 47; Burgos ¶ 51; Massei Compl. ¶ 45; Trocchio Compl. ¶ 47, nor was any notice ever provided to any of the plaintiffs' friends and family, or to the Mental Hygiene Legal Services.  Bailey Compl. ¶ 51;[1] Brooks Compl. ¶ 47; Burgos ¶ 51; Massei Compl. ¶ 45; Trocchio Compl. ¶ 47; Warren Compl. ¶ 55.  No plaintiff had an opportunity to request or was afforded a pre-commitment hearing and opportunity to be heard.  Bailey Compl. ¶¶ 43-

---

[1] Bailey alleges that when his fiancee' spoke on the telephone with one of the defendants, she was told that Bailey would be held at the Manhattan Psychiatric Center "indefinitely," and that when she asked what that meant, she was told that it meant "for the rest of his life."  Bailey Compl. ¶ 51.

44, 46-47; Brooks Compl. ¶ 47; Burgos ¶ 51; Massei Compl. ¶ 45;
Trocchio Compl. ¶ 47; Warren Compl. ¶ 55.  In addition, plaintiff
Burgos did not receive an Article 9 retention hearing until
approximately October 2007, two years after his initial involuntary
commitment, Burgos Compl. ¶ 62, and plaintiffs Bailey and Trocchio
allege that they never received an Article 9 retention hearing
period.  Bailey Compl. ¶ 57; Trocchio Compl. ¶ 55.[2]

    When viewed in light of the Supreme Court's clear admonition
in Vitek that prisoners are entitled to certain pre-transfer
procedural safeguards, the foregoing allegations sufficiently
demonstrate that defendants denied plaintiffs such procedures as were
essential to protect plaintiffs from erroneous deprivations of their
"substantial liberty interest[s] in not being confined unnecessarily
for medical treatment."  Parham v. J.R., 442 U.S. 584, 600 (1979).

    In response, defendants argue that Vitek v. Jones did not
establish a federal right to pre-commitment notice and hearing,
because that case only addressed a Nebraska statute that permitted
commitment of a prisoner on the certification of a single physician
or psychologist without any judicial or medical review.  This is far
too narrow a reading of Vitek, which is plainly premised on the
Court's conclusion that "the transfer of a prisoner from a prison to

_____

    [2] Defendants contend in their moving papers that all
plaintiffs except Warren "requested, but did not schedule a
hearing," see, e.g., Defendants' Memorandum of Law in Support of
Motion to Dismiss the Brooks Complaint at 5, but these
assertions, among other infirmities, cannot properly be
considered on a motion to dismiss pursuant to Fed. R. Civ. P.
12(b)(6).  See Friedl v. City of New York, 210 F.3d 79, 83 (2d
Cir. 2000).

a mental hospital must be accompanied by appropriate procedural protections," and that pre-commitment "notice is essential to afford the prisoner an opportunity to challenge the contemplated action and to understand the nature of what is happening to him."  445 U.S. 480, 491, 496 (1980).

Defendants also point to Project Release v. Prevost, 722 F.2d 960, 963 (2d Cir. 1983), in which the Second Circuit considered the question of "whether standards and procedures [for involuntary commitment] embodied in [Article 9] meet federal constitutional due process minima."  Plaintiffs in that action argued, inter alia, that the procedures set forth in Article 9 "violate due process by failing to require automatic preliminary and full commitment hearings within forty-eight hours [] of admission," id. at 972, and by failing to give patients "pre-hearing notice of the facts underlying their commitment, including access to hospital records."  Id. at 975 n.16. The Second Circuit, construing plaintiffs' action as a purely facial challenge to the statute, id. at 970, concluded that "[o]n its face," the statute "reflects a careful balance between the rights of the individual and the interests of society."  Id. at 974.  The arguments presented in Project Release, however, were limited to certain specific aspects of Article 9, and that case did not involve the transfer of inmates to mental institutions, nor did it address or consider Article 9's lack of pre-deprivation procedural safeguards. Moreover, the court made no specific mention of whether or not transfer to a mental institution without the certification of a court-appointed doctor comports with due process.  Indeed, the Second

8

Circuit emphasized that "whether the statute is __applied__
constitutionally remains an open question, the resolution of which
may be accomplished only in the context of an appropriate 'as
applied' challenge." __Id.__ at 971 (emphasis in original).  At this
stage, without the benefit of discovery, the Court is satisfied that
the above-captioned actions present such a challenge and that
plaintiffs have adequately alleged a basis for inferring that the
procedural protections afforded by Article 9, as applied in these
instances, were less than what was constitutionally required.

        Defendants further argue, however, that, even if their
alleged conduct interfered with a protected right, the facts alleged
by the plaintiffs fail to demonstrate that the right was "clearly
established" and hence they are still entitled to qualified immunity.
__Scott v. Harris__, 550 U.S. 372, 377 (2007).  The Court's analysis in
this respect turns on whether "(1) the law is defined with reasonable
clarity, (2) the Supreme Court or the Second Circuit has recognized
the right, and (3) a reasonable defendant would have understood from
the existing law that his conduct was unlawful."  __Luna v. Pico__, 356
F.3d 481, 490 (2d Cir. 2004) (internal quotation marks omitted).
Because qualified immunity is an affirmative defense, defendants
"bear the burden of showing that the challenged act was objectively
reasonable in light of the law existing at that time."  __Varrone v.
Bilotti__, 123 F.3d 75, 78 (2d Cir. 1997).

        As early as in 1980, in __Vitek__, the United States Supreme
Court unequivocally held that a prisoner has a constitutional right
to prior notice and an opportunity to be heard __before__ being

9

transferred from prison to a mental hospital, see Vitek, 445 U.S. at 493, and in 1990, the Court emphasized that states must provide pre-deprivation procedural safeguards whenever they can "feasibly" do so. Zinermon, 494 U.S. at 132. Thus, it is beyond cavil that, at the time of their transfer and involuntary commitment, plaintiffs were entitled to certain pre-transfer procedural safeguards, including notice, an opportunity to be heard, and a psychiatric evaluation by court-appointed doctors, and that defendants could not have reasonably believed that their concomitant failure to provide such safeguards was lawful.

The Second Circuit has observed, however, that higher ranking officials "are held to a higher standard of legal knowledge than are their subordinates," Charles W. v. Maul, 214 F.3d 350, (2d Cir. 2000), and defendants thus argue that those mental hygiene examiners and physicians named as defendants — who were merely exercising their professional judgment and following orders — could have reasonably believed that necessary legal justifications existed for their actions. See Vitek, 445 U.S. at 495 ("the inquiry involved in determining whether or not to transfer an inmate to a mental hospital for treatment involves a question that is essentially medical" and that "turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists") (citation and quotation omitted); cf. Lauro v. Charles, 219 F.3d 202, 216 n.10 (2d Cir. 2000) (noting that the fact that defendant was following orders given by his superiors supported the existence of qualified immunity).

10

But even a lower ranking subordinate could not have reasonably believed that the perfunctory procedures here provided (as alleged by plaintiffs) remotely comported with elementary fairness and due process.  Here, for instance, plaintiffs Bailey and Burgos were certified for involuntary commitment after each being examined for approximately fifteen minutes.  Bailey Compl. ¶ 48, Burgos Compl. ¶ 48.  Burgos' examination merely consisted of being asked questions about the crime underlying his prison sentence, which occurred twenty-five years earlier.  Burgos Compl. ¶¶ 39, 49.  Similarly, plaintiff Brooks was certified as mentally ill after meeting with two physicians for "no longer than a couple of minutes," during which time the doctors "asked him some general questions which they claimed was routine protocol given that plaintiff was to be released in a few days."  Brooks Compl. ¶ 44.  Plaintiff Massei's evaluation "was of very short duration" and was conducted by two psychiatrists, only one of whom was physically present.  Massei Compl. ¶ 42.  Massei was never asked about the facts of his underlying crime, his previous sexual offenses, or his psychological or emotion state of mind.  Id. Plaintiff Trocchio was certified after being examined "for no more than twenty minutes" by a psychiatrist who appeared on a television monitor.  Trocchio Compl. ¶ 45.  The psychiatrist asked Trocchio how he was feeling and made general inquiries into his health, but never asked any questions about his underlying crime, previous sexual offenses, or his sexual inclinations.  Id. Even plaintiff Warren, though afforded somewhat less cavalier treatment than the other plaintiffs, was certified for psychiatric treatment after being

11

"evaluated" in cursory fashion by two psychiatrists the day before he was scheduled to be conditionally released from prison.  Warren Compl. ¶¶ 48-49.

Once "certified" for involuntary commitment, all six plaintiffs were transported to state-run psychiatric facilities in handcuffs and shackles, where they met with or were evaluated by medical staff and were involuntarily committed for psychiatric treatment.  Bailey Compl. ¶¶ 54-56; Brooks Compl. ¶¶ 48-50; Burgos Compl. ¶¶ 54-58; Massei Compl. ¶¶ 49-51; Trocchio Compl. ¶¶ 51-54; Warren Compl. ¶¶ 53-54.  Plaintiff Massei was never interviewed by any psychiatrist upon his arrival at the mental hospital, Massei Compl. ¶ 50, and when plaintiff Trocchio was examined at the hospital, a psychiatrist merely asked him "a few broad questions, none of which pertained to [his] prior crime or sexual inclinations." Trocchio Compl. ¶ 53.

The foregoing allegations – which, at this stage, the Court accepts as true for purposes of the instant motion practice - demonstrate that the procedures used to involuntarily commit plaintiffs, consisting at best of cursory evaluations lasting no more than twenty minutes, were hardly adequate to provide any meaningful assessment of plaintiffs' actual mental health or proclivity to commit future crimes.  In such circumstances, no person (regardless of rank) could plausibly believe that the process afforded to plaintiffs was objectively reasonable and consistent with the rights defendants are alleged to have violated.  Accordingly, at this stage of the litigation, and without discovery as to the circumstances

12

surrounding each individual plaintiff's involuntary commitment, defendants cannot hide behind the shield of professional judgment in order to avoid liability for conduct that violated plaintiffs' otherwise clearly established rights.  See Vitek, 445 U.S. at 495 (noting that "[t]he medical nature of the inquiry . . . does not justify dispensing with due process requirements").

Defendants also argue that plaintiff Warren's complaint should be dismissed insofar as it rests on defendants' alleged failure to engage in parole revocation proceedings.  Although it is well-established that a convicted individual has no constitutional right per se to be conditionally released before the expiration of his sentence, Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979), such a right may come into existence where the State has adopted a statutory framework where parole is automatic when an inmate has served his maximum term less good-time credit.  Wolff v. McDonnell, 418 U.S. 539 (1974). Moreover, where an inmate has been paroled, he is entitled to procedural due process before parole is revoked and the inmate is re-incarcerated.  Morrissey v. Brewer, 408 U.S. 471, 484 (1972).  Here, Warren alleges that he was conditionally released to parole contemporaneously with his involuntary commitment to a state-run mental hospital, and that when he was released from the hospital two months later, he was immediately returned to a state prison without any parole revocation hearing.  Warren Compl. ¶¶ 45, 53, 56-57, 60, 63, 66-69.  Accepting such allegations as true, plaintiff has demonstrated that his post-hospital prison confinement, without any

13

hearing or opportunity to be heard, was unlawful and in violation of
his clearly established Constitutional rights.  Although the Second
Circuit has emphasized that the "New York parole scheme is not one
that creates in any prisoner a legitimate expectancy of release,"
Barna v. Travis, 239 F.3d 169, 171 (2d Cir. 2001), Warren here
alleges that he was offered and signed a Certificate of Release to
Parole and that the New York State Board of Parole had approved a
temporary and permanent residence for plaintiff, Warren Compl. ¶¶ 46-
47, thus demonstrating that Warren faced more than a mere possibility
of parole.  See Green v. McCall, 822 F.2d 284, 287 (2d Cir. 1987) ("a
parole grantee has a protectible liberty interest that entitles him
to due process in the Commission's parole rescission hearings").

     The Court is mindful of the need for qualified immunity
questions to "be resolved at the earliest possible stage of a
litigation."  Anderson v. Creighton, 483 U.S. 635, 646 (1987).
Nevertheless, such determinations must be "made in view of the
procedural posture of this case."  Velez v. Levy, 401 F.3d 75, 101
(2d Cir. 2005).  Although a better factual basis for affording
qualified immunity to one or more of the defendants here may arise
during the course of discovery, the Court cannot now, accepting all
of plaintiffs' allegations as true, conclude that defendants are
entitled to qualified immunity as a matter of law.  See Johnson v.
Newburgh Enlarged Sch. Dist., 239 F.3d 246, 255 (2d Cir. 2001).
Accordingly, for all of the foregoing reasons, defendants' motion to
dismiss based on qualified immunity is denied, without prejudice to
defendants renewing their motion at the close of discovery.

14

In the alternative, defendants urge this Court to exercise its discretion to abstain from hearing those claims brought by plaintiffs Bailey, Brooks, and Burgos, pursuant to <u>Younger v. Harris</u>, 401 U.S. 37 (1971), which "generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." <u>Diamond "D" Constr. Corp. v. McGowan</u>, 282 F.3d 191, 198 (2d Cir. 2002). In order for <u>Younger</u> abstention to apply, (1) there must be an ongoing state proceeding; (2) an important state interest must be implicated in that proceeding; and (3) the state proceeding must afford the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims that form the basis for the federal action. <u>Id.</u> This doctrine is properly invoked "only in exceptional circumstances," however, <u>New Orleans Pub. Serv., Inc. V. Council of New Orleans</u>, 491 U.S. 350, 368 (1989), and the Second Circuit has emphasized that "[w]hen money damages, as opposed to equitable relief, are sought, it is less likely that unacceptable interference with the ongoing state proceeding, the evil against which <u>Younger</u> seeks to guard, would result from the federal court's exercise of jurisdiction." <u>Kirschner v. Klemons</u>, 225 F.3d 227, 238 (2d Cir. 2000).

Here, defendants note that Bailey, Brooks, and Burgos are all the subject of ongoing Article 10 proceedings in state court, which involve the management of sex offenders and which relate to an important state interest. The sole issues that these plaintiffs may raise in their Article 10 proceedings, however, are whether a

defendant suffers from a "mental abnormality" and whether that
defendant is a "dangerous sex offender requiring confinement" or a
"sex offender requiring strict and intensive supervision."  N.Y.
Mental Hyg. Law § 10.07(a), (d), (f); see id. § 10.06(g) (Article 10
hearings limited to "whether there is probable cause to believe that
[the defendant] is a sex offender requiring civil management").
Indeed, defendants themselves concede that plaintiffs cannot obtain
money damages in their Article 10 proceedings.  Accordingly, because
plaintiffs' Article 10 proceedings will not afford them an adequate
opportunity for judicial review of their federal constitutional
claims arising out of their commitment pursuant to Article 9,
defendants have failed to demonstrate that the instant actions
present the "exceptional circumstances" necessary to warrant Younger
abstention.  See Kirschner, 225 F.3d at 238 (noting "that the other
prerequisites for Younger abstention may not be met as to this claim,
because it is highly unlikely that [plaintiff] could bring his § 1983
claim for money damages against [defendant] in his Article 78
proceeding").

        Finally, defendants argue that, to the extent that plaintiffs
Bailey, Burgos, Massei, Trocchio, and Warren seek to allege injuries
separate and apart from their commitment under Article 9, they have
failed to establish the requisite personal involvement between
defendants and any constitutional deprivation plaintiffs may have
experienced.  See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)
("It is well settled in this Circuit that 'personal involvement of
defendants in alleged constitutional deprivations is a prerequisite

                                16

to an award of damages under § 1983'") (citation omitted).

Plaintiffs' complaints are not entirely clear as to whether or not

plaintiffs seek to recover damages for any conduct unrelated to their

involuntary transfer and commitment to state-run psychiatric

facilities.   To the extent that they do, the Court agrees that none

of these plaintiffs has identified any person who might be personally

involved in any other alleged constitutional deprivations and that

these plaintiffs thus cannot pursue any claim unrelated to their

commitment pursuant to Article 9.[3]

        For the foregoing reasons, the Court hereby reaffirms its

previous order denying defendants' motion to dismiss.

        SO ORDERED.

                                    JED S. RAKOFF, U.S.D.J.


Dated:  New York, New York
        July 10, 2009

---

[3] Plaintiffs assert a variety of other federal and state
claims.   Defendants have not articulated a separate basis for
dismissing those claims, and this Memorandum Order thus does not
address the validity of those claims.   In the end, though, many
of these claims likely will be viewed as duplicative of
plaintiffs' procedural due process claims.

17