IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| KENNETH BAILEY, | 08-Civ-8563 (JSR) |
| CHARLES BROOKS, | 08-Civ-8665 (JSR) |
| SYLVIA TORRES, as Administratrix of the Estate of | |
| Jorge Burgos, Jr., | 08-Civ-8924 (JSR) |
| LOUIS MASSEI, | 08-Civ-8923 (JSR) |
| ROBERT TROCCHIO, | 08-Civ-8925 (JSR) |
| ROBERT WARREN, | 08-Civ-9609 (JSR) |

       PLAINTIFFS

               DECLARATION OF
  vs.               AMEER BENNO

GEORGE PATAKI, et al.,

       DEFENDANTS
_____

  AMEER BENNO declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

  1. I am an attorney with BENNO & ASSOCIATES P.C., one of the attorneys for the six plaintiffs in the above matter, and as such, am familiar with the facts and circumstances in conjunction therewith. I submit this declaration in support of plaintiffs' motion for an order pursuant to Fed. R. Civ. P. 54(d) for attorney's fees, costs, and disbursements under 42 U.S.C. § 1988, and for such other and further relief as this Court deems just, proper, and equitable.

  2. In support of the within application, I submit the following exhibits, which are annexed hereto:

  <u>Exhibit A</u>: Judgment entered August 6, 2013 in favor of plaintiffs

and against defendant Sharon Carpinello;

Exhibit B: Time records for Ameer Benno, documenting 2,724.9 hours expended in the litigation of this case;

Exhibit C: Itemized statement of litigation expenses, totaling $157,519.28.

Exhibit D: Declaration of Myron Beldock, dated September 26, 2013.

Exhibit E: Declaration of Matthew Brinckerhoff, dated September 30, 2013.

Exhibit F: Declaration of Edward Sivin, dated September 27, 2013.

Exhibit G: Declaration of Glenn Miller, dated September 27, 2013.

Additional pertinent materials are annexed as exhibits to the Declarations of my co-counsel, also submitted in support of the instant application.

## **ATTORNEY BACKGROUND AND EXPERIENCE**

3. I received my Bachelors of Arts degree in 1998 from the Johns Hopkins University, and my J.D. from Cornell Law School in 2002. At Cornell, I was very active in moot court, and sat on the Moot Court Board. I was a finalist in the Cornell Law School Moot Court Competition, and I represented Cornell Law School in the Willem C. Vis International Commercial Arbitration Moot Court Competition, the N.Y.C. Bar Association's 51st Annual National Moot Court Competition, the 2001 Jessup International Law Moot Court Competition, and the Fasken International Law Moot Court Competition.

4. Upon graduating from Cornell Law School, I worked for nearly six years as an Assistant District Attorney at the New York County District Attorney's Office under then-

District Attorney Robert Morgenthau, where I gained considerable trial and appellate experience. I spent approximately four years in the trial division, where I prosecuted hundreds of criminal cases, handled investigations, and served as lead prosecutor in numerous misdemeanor and felony trials, Grand Jury presentations, and evidentiary and suppression hearings. In the appeals bureau, I researched complex issues of criminal law, drafted briefs in response to criminal appeals in both white collar and street crime cases, and drafted briefs in response to Article 78 petitions, petitions for writs of error coram nobis, and petitions for state and federal writs of habeas corpus. I regularly argued before panels of judges at the Appellate Division, First Department.

5. After leaving the D.A.'s Office, I worked as an Associate for two civil litigation law firms, Shandell, Blitz, Blitz, & Ashley, LLP, and Burns and Harris, where I tried civil cases and managed a caseload that focused on civil rights matters in state and federal court.

6. In 2009, the firm at which I was employed closed, and I thereafter opened my own law practice, which focuses on civil rights cases in state and federal court, appellate litigation, and criminal defense.[1] I am admitted to practice in New York and Connecticut, in the federal district courts for the Southern, Eastern, and Northern Districts of New York, and in the Second Circuit Court of Appeals.[2] I am a member of the Felony Assigned Counsel Plan for the Second Department, the Criminal Appellate Panel for the Second Department, and the Criminal Appellate Panel for the Third Department.

7. A sampling of civil rights cases I have litigated or participated in litigating in New York State courts include: <u>He v. City of New York, et al.</u>, Index No. Index No. 700008/12

---

[1] In 2010, the name of my practice changed from "The Law Office of Ameer Benno" to "Benno & Associates P.C." The firm's practice areas remained the same, however.

[2] I am presently on inactive status in Connecticut.

3

(Sup. Ct. Queens Co.) (false arrest and excessive force against various NYPD officers); Wilson v. City of New York, et al., Index No. 702529/2012 (Sup. Ct. Queens Co.) (alleging claims for Brady violations and malicious prosecution against NYPD officers); Wilson v. State, Claim 120470 (Ct. Cl.) (unjust conviction claim for 10 years' incarceration); Khatibi v. State, Claim No. 117567 (Ct. Cl.) (unjust conviction claim in the New York State Court of Claims); Morris v. City of New York, et al., 108687/2011 (Sup. Ct. N.Y. Co.) (Section 1983 based asserting false arrest, First Amendment, and Monell claims); Robinson v. City of New York, et al., Index No. 50007/09 (Sup. Ct. Kings Co.) (Section 1983 case based on false arrest and excessive force); Smith v. City of New York, et al., Index No. 402346/10 (Sup. Ct. N.Y. Co.) (Section 1983 case based on excessive force); Feliciano v. City of New York, et al., Index No. 401261/08 (Sup. Ct. N.Y. Co.) (Section 1983 case based on false arrest and malicious prosecution); Young v. City of New York, et al., Index No. 301162/07 (Sup. Ct. Bronx Co.) (Section 1983 case based on false arrest, malicious prosecution, and excessive force).

8. A sampling of civil rights cases I have litigated or participated in litigating in federal court include: Sauerwald v. City of New York, et al., 13-Civ-4226 (RA) (Section 1983 action based on false arrest, excessive force, and malicious prosecution); Brown, et al.. v. City of New York, et al., 12-CV-6831 (SAS)(KNF) (Section 1983 action based on illegal search of residence, false arrest, and malicious prosecution); Williams, et al. v. Connell, et al., 12-CV-3593 (SLT)(VVP) (Section 1983 action based on inmate death due to deliberate indifference of corrections staff); Maynard v. City of New York, et al., 11-CV-7160 (TPG) (Section 1983 action based on false arrest, excessive force, and First Amendment violations); Lilly v. City of New York, et al., 11-CV-6015 (CM) (Section 1983 action alleging false arrest, excessive force, illegal strip

search, and First Amendment violations); Khatibi v. Bonura, et al., 10-CV-1168 (ER)(PED) (Section 1983 claims for malicious prosecution and Brady violations leading plaintiff to be incarcerated for 9.5 years); Khudashvili v. City of New York, et al., 10-CV-0774 (SAS)(JCF) (Section 1983 claim based on false arrest, malicious prosecution, and excessive force arising out of police misconduct during the execution of search warrant); Burt v. Aleman, 05-CV-4493 (JG)(CLP) (Section 1983 action on Brady violations); and Bessendorf v. City of New York, et al., 09-CV-9885 (CM) (JCF) (Section 1983 action based on false arrest and excessive force).

9. In addition to cases seeking damages, I also litigate cases that seek declaratory and injunctive relief. In Bravo, et al. v. City of New York, et al., Index No. 21151/2012E (Sup. Ct. Bronx Co.), I brought suit under Section 1983 and the Americans with Disabilities Act, challenging the legality and constitutionality of the New York State Public Health Law statute that makes it an offense to keep prescription medication outside of its original container. That case is presently being litigated in New York State Supreme Court.

10. My practice also handles class action litigation, and I have been co-lead class counsel on three civil rights putative class action lawsuits -- two in federal court, and one in state court: Wheeler v. Pataki, et al., 07-Civ-0892 (TJM)(TWD) (Section 1983 action based on unconstitutional state civil commitment policy); Mothersell v. City of Syracuse, et al., 08-Civ-615 (NAM) (TWD) (Section 1983 action arising out of Syracuse Police Department's unconstitutional policy and practice of conducting blanket in-field strip searches when executing "all persons present" search warrants); and Onadia v. City of New York, et al., Index No. 300940/10 (Sup. Ct. Bronx Co.) (Section 1983 action based on New York City Department of Corrections' policy and practice of routinely and unlawfully maintaining custody of arrestees subject to ICE detainers well

beyond the authorized 48-hour period).[3]

11.  In addition to an active trial practice (in 2011 alone, I tried seven civil cases in New York State courts), I also maintain a vibrant appellate practice. I have briefed and argued criminal and civil appeals in the First, Second, Third, and Fourth Departments of the New York State Supreme Court, Appellate Division, and have also argued in the New York State Court of Appeals and the United States Court of Appeals for the Second Circuit. Most recently, I argued the appeals in People v. Gathers, 106 A.D.3d 1333 (3d Dept. 2013); People v. Leone, 105 A.D.3d 1249 (3d Dept. 2013); and People v. Leone, 101 A.D.3d 1352 (3d Dept. 2012). I also recently submitted the briefing in Williams, et al. v. State, presently sub judice in the Fourth Department, which addresses the scope of recoverable damages under the New York State Constitution for wrongful death occasioned by the misconduct of New York State corrections officers. I am presently litigating in the Second Department the appeal in Wilson v. State, a case arguing for a more expansive interpretation of New York State's Unjust Conviction Act under Section 8-b of the New York State Court of Claims Act. In 2010, I argued the criminal appeal in People v. Mothersell before the New York State Court of Appeals, which resulted in the unanimous reversal of Mr. Mothersell's criminal conviction and the dismissal of his indictment. See People v. Mothersell, 14 N.Y.3d 358 (2010). And, of course, I briefed and argued the interlocutory appeal in this case before the Second Circuit, which resulted in a unanimous affirmance of Your Honor's denial of defendants' motion for summary judgment on the basis of qualified immunity. See Bailey v. Pataki, 708 F.3d 391 (2d Cir. 2013).

---

[3] Both the Wheeler and Onadia cases are presently in the class discovery phase. In Mothersell, Judge Mordue, of the U.S. District Court for the Northern District of New York, recently denied class certification; we were then able to negotiate a settlement satisfactory to our individual client.

12. For over six years, between 2006 and 2012, I was an adjunct professor at New York Law School, where I taught Legal Reasoning and Writing and Written and Oral Advocacy to first-year law students, as well as an upper-level legal writing elective. Recently, I was invited to become faculty at Lawline.com giving continuing legal education presentations on civil rights law.

13. Additionally, I am active with several bar and professional associations. I serve on the Civil Rights and Liberties Section of the New York County Lawyers Association, the Civil Rights Section of the Association of the Bar of the City of New York, and the Civil Rights Section of the American Association of Justice. I am a member of the First Amendment Lawyers Association, the National Police Accountability Project,[4] the New York City Policing Roundtable,[5] the New York State Trial Lawyers Association, and the New York State Academy of Trial Lawyers.

14. In 2012 and again in 2013, I was selected to the Super Lawyers Rising Stars list as one of the top up-and-coming attorneys in the metro-New York area in the areas of First Amendment and civil rights law. Each year, no more than 2.5 percent of the lawyers in the state receive this honor. In 2013, I was also selected by the National Trial Lawyers for inclusion in the Top 100 trial attorneys in New York State in the area of criminal law. This is an invitation-only organization composed of the premier trial lawyers from each state in the nation who meet stringent

---

[4] The National Police Accountability Project is a non-profit organization dedicated to ending police abuse of authority through coordinated legal action, public education, and support for grassroots and victims' organizations.

[5] The New York City Policing Roundtable is a non-profit organization that nurtures relationships between civil rights and public interest attorneys, community organizers, advocates, policy analysts, academics, and others who work to end police misconduct in New York City, and which provides legal training and technical support, and advocates for systemic reforms.

qualifications. Selection is based on a thorough multi-phase process which includes peer nominations combined with third-party research.

15. Those I represent in civil rights cases cannot afford the services of a lawyer on an hourly basis or make any contribution to litigation expenses. I take civil rights cases on a contingency basis, and I am compensated based on a portion of any judgment or settlement, or through the payment of fees by the defendants. Because the inherent risk in any civil rights case is high, and because civil rights cases are frequently protracted and hotly litigated, civil rights lawyers like me depend on the availability of a lodestar recovery in the event that we do prevail.

## TIME RECORDS AND LITIGATION EXPENSES

16. All hours worked by me were recorded in .1 hour increments. My contemporaneous records are annexed hereto as **Exhibit "B"**.[6]

17. As documented in those records, I spent 2,724.9 hours in the prosecution of this action. Id.

18. Plaintiffs' counsel incurred significant litigation expenses in the prosecution of these cases, as well. The expenses incurred by all plaintiffs' counsel in connection with this litigation for which reimbursement is sought -- a total of $157,519.28 -- are compiled on an Excel spreadsheet, which is annexed hereto as **Exhibit "C"**.

### Hours Expended and Applicable Rate

19. During the summer of 2008, I was contacted by a family member of plaintiff Charles Brooks, who had been civilly committed to a New York State-operated psychiatric hospital

---

[6] Minor redactions have been made to the time records to protect the attorney-client privilege and to protect attorney work product. For example, all references to the *contents* of telephone conversations or correspondence between plaintiffs and counsel have been redacted.

in the fall of 2005 in connection with the SVP Initiative. The family member had read about me online, and explained to me that Mr. Brooks, who at that point was still confined at Manhattan Psychiatric Center, was interested in finding a civil rights attorney who could help him obtain redress for the violation of his civil rights occasioned by his civil commitment.

20. After speaking at length with Mr. Brooks himself, which included trips to the psychiatric facility, and vigorously researching the facts of the SVP Initiative, the circumstances surrounding Mr. Brooks's civil commitment, and the applicable law, I concluded that a serious violation of Mr. Brooks's state and federal constitutional rights had occurred. Multiple conversations and meetings with Mr. Brooks followed, as well as conversations and meetings with others who had been civilly committed under the SVP Initiative roughly contemporaneously with Mr. Brooks. Ultimately, the firm with which I was associated at the time, Shandell, Blitz, Blitz & Ashley, LLP ("SBBA"), was retained to represent Mr. Brooks and some of these other individuals -- namely, Kenneth Bailey, Jorge Burgos, Jr., Louis Massei, Robert Trocchio, and Robert Warren -- in separate civil rights actions based on their unconstitutional civil commitments under the SVP Initiative. After three long, hard years, years, these plaintiffs -- sexual offenders all -- had finally found an attorney who was willing to take on their case.

21. Six separate Complaints were thereafter filed, and, after receiving responses from several Freedom of Information Law requests, five of them were amended. The Amended Complaints were served on the defendants between late January and early February, 2009.

22. On March 11, 2009, defendants in all six actions moved to dismiss the Amended Complaints under Fed.R.Civ.P. 12(b)(6) on the basis of qualified immunity (see Docket

Entry # 22).⁷  On behalf of all six plaintiffs, I submitted opposition to that motion on April 1, 2009 (see Docket Entry # 27).  Defendants submitted their replies on or around April 8, 2009 (see Docket Entry # 28), and oral argument on the motions was heard by this Court on May 14, 2009.  On June 10, 2009, this Court issued an Order denying defendants' Fed.R.Civ.P. 12(b)(6) motions (see Docket Entry # 29).⁸

23.  In early to mid-June 2009, the senior partners at SBBA informed me that the firm would close its doors at the end of the month.  This unexpected news came as a great surprise to me.  The logistical demands of wrapping up a practice that had existed for over thirty years and vacating our physical office space became the priority of all the staff there for the remainder of the month.

24.  Near the end of June 2009, I decided to open my own litigation law practice, focused on civil rights matters, appellate practice, and criminal defense.  When I informed Messrs. Brooks, Bailey, Burgos, Massei, Trocchio, and Warren, of this, they expressed their desire that I continue as their attorney.

25.  I believed that a great injustice had been done to these men when they were involuntarily civilly confined, but I was also aware that the plaintiffs had been unable, before retaining SBBA, to find an attorney willing to take on their case.  And, as these were plaintiffs who had been convicted of and incarcerated for deeply disturbing crimes -- many for up to a quarter century -- who were socially marginalized and low-income, and who lacked the knowledge and familiarity with the court system, let alone access to it, to effectively pursue their claims against

---

⁷ All citations to the docket relate to the docket of <u>Bailey v. Pataki, et al.</u>, 08-Civ-8563 (JSR).

⁸ A formal Opinion and Order explaining the basis for this decision was issued by Your Honor on July 20, 2009.

defendants on their own would have been exceedingly difficult for them. Indeed, those who were still confined did not even have access to a law library. Thus, in July 2009, when I opened my practice as a sole practitioner, I was retained in that capacity by the six plaintiffs herein.

26. Given the complexity and anticipated expense of these six cases, I actively tried to find attorneys and law firms to partner with me in the prosecution of these cases. I spent practically all of July 2009 trying to secure an arrangement that would provide me with both the financial resources and manpower necessary to litigate these actions. I met or spoke with over a dozen firms throughout New York State regarding this.

27. Many of the firms and lawyers I discussed these cases with were disinterested in participating in or assisting with the litigation in any way. The reasons included concern that plaintiffs could not prove that had the correct procedures been used that they would not have been committed anyway, that that it would be very difficult to prove personal involvement in these cases (especially since, at that time, the effect of the Supreme Court's recent decision in Ashcroft v. Iqbal, 129 S.Ct. 1937 [2009] was still unknown and unpredictable), that the Eleventh Amendment barred any Monell-type action by which the State could be held responsible for the SVP Initiative, if it were determined to have been unconstitutional, and that the ever-present risk of qualified immunity threatened to extinguish the case even if a constitutional violation could be proved. In addition to these daunting legal risks, the nature of the plaintiffs' underlying sex offenses -- which, of course, were the precipitating factor for why they were civilly committed in the first place -- also loomed large. No matter how egregious the constitutional violations that plaintiffs suffered were, no one believed that these plaintiffs would ever be able to get a fair shake by the court or, if it got that far, a jury. The expense -- both in money, time, and human capital –

that needed to be put into these cases, was deemed unlikely to ever net a financial return, and therefore involvement in these cases was considered by many of the lawyers I spoke with to be a bad business decision. Sadly, more than a few attorneys refused to have their or their firm's name associated with these cases simply because they were fearful that representing sexual offenders in any way would blemish their public image.

28. I eventually was able to secure commitments from Reza Rezvani and Jeffrey Rothman, two other sole practitioners, to participate with me in litigating these cases. I also received commitments from Matthew Walters, an attorney in a two-person practice, and David Roth, an attorney in a similarly small practice, to provide resources to assist in the litigation. In early August 2009, Your Honor ordered that I be substituted for SBBA as plaintiffs' counsel in these six actions (see Docket Entry # 35). All of us hoped to obtain a judgment holding defendants liable for the violation of plaintiffs' constitutional rights, and to hopefully also obtain for these men a monetary recovery to compensate them for the years of their liberty that were unjustifiably taken from them.[9]

29. The litigation that followed was hard-fought and difficult. It involved tens of thousands of pages of paper discovery, dozens of depositions, extensive motion practice, an interlocutory appeal to the Second Circuit, and a long trial. On several occasions, it required travel outside of the Southern District to meet with plaintiffs, take and defend depositions, and confer with experts.

30. Numerous hours were expended conducting discovery. Plaintiffs' counsel were required to carefully and thoroughly review and organize the voluminous records that were

---

[9] Attorney Richard Sullivan joined the team during the litigation of the cross-motions for summary judgment, and attorney Brian Doyle joined the team when these cases were being prepared in

produced, which included each plaintiff's medical and mental health records, correctional records relating to each plaintiff's guidance, disciplinary, and education files while incarcerated, and Parole records. As three of the plaintiffs had been incarcerated for twenty-five years at the time of their civil commitment (the other three ranged between eight and twelve years each), and three of the plaintiffs had been civilly committed for over four years when the documents were first produced, the organization and review of these records was very time consuming. In addition to the plaintiff-specific records, plaintiffs' counsel had to comb through thousands of pages of records produced by OMH, DOCS, Parole, DCJS, and the Executive Chamber pertaining to the creation, development, and implementation of the SVP Initiative. Painstaking review of all these thousands of pages of records was essential in order to be adequately prepared for the extensive motion practice, depositions, interlocutory appeal, and trial that this case required.

31. As Your Honor is aware, this case involved substantial written submissions. Aside from discovery demands and responses to defendants' discovery demands, plaintiffs litigated a motion to dismiss the Complaints under Fed.R.Civ.P. 12(b)(6), a motion for judgment on the pleading and to strike defendants' affirmative defenses under Rules 12(c) and (f), and voluminous cross motions for summary judgment (including very lengthy 56.1 Statements and Responses). There also were numerous letter motions (involving such matters as privileges and privilege logs, protective orders, motions to quash subpoenas and depositions, and motions for reconsideration), the response to defendants' interlocutory appeal, and, of course, the comprehensive and extensive trial-related submissions. All of this was, of course, essential to the case, and had plaintiffs not pressed as hard as we did at every stage of the litigation, we would not have obtained certain key documents from defendants (which had been withheld initially on the basis of the deliberative

anticipation of trial. 13

process privilege) or been allowed to take the depositions of Governor Pataki, Commissioners Carpinello and Goord, and Executive Director Consilvio. The judgment against defendant Carpinello could not have been obtained but for the evidence we gathered as a result of our efforts. See generally Moreno v. County of Sacramento, 534 F.3d 1106 (9th Cir. 2008) ("the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker"). Further, given the volume of written material in this case, it was necessary for many of us to exchange drafts of documents and to collaboratively edit each other's work. This enabled us to be up to speed on the essential issues and developments in the case, and to optimize our final product.

32. These actions required literally dozens of depositions, as well. Plaintiffs deposed almost all of the physicians involved in the civil commitments of the six plaintiffs herein, and deposed many representatives from OMH, DOCS, Parole, and the Executive Chamber, as well as the higher ranking defendant officials. While plaintiffs' counsel attempted throughout the course of the litigation to avoid unnecessarily redundant work, it was frequently necessary for more than one attorney to attend each deposition. This resulted in greater efficiency and allowed us to meet the tremendous resources that defendants put into defending this case. Undeniably, we were out-resourced at every stage of the case, but still were able to achieve multiple interim victories along the way, and to ultimately prevail following a very lengthy trial with dozens of witnesses.

33. And, of course, after defendants' motion for summary judgment on the basis of qualified immunity was denied, they took an interlocutory appeal to the Second Circuit Court of Appeals. Responding to this appeal took a great deal of time as well, and drew upon a

voluminous record.  As qualified immunity is an ever-shifting area of law, the factual review, legal research, briefing, and oral argument called for significant expenditures of time.  The hard work on the appeal paid off, of course, as plaintiffs won a unanimous affirmance from the Second Circuit.

34. As Your Honor is surely aware, the trial of these actions, which lasted three and a half weeks, required extensive preparation and work.  In addition to preparing the voluminous pre-trial submissions, I oversaw the logistics of preparing plaintiffs' case for trial.  Among many other things, I ensured that all pretrial exchanges were made, that the witnesses were subpoenaed, that the plaintiffs were made available (which required getting writs drawn, signed and served and working out the logistics with both Parole, local jails, and the federal Marshals), and that all of the exhibits and deposition transcripts were prepared and copied.  I also managed the logistics of plaintiffs' case as the trial progressed.  I juggled this while at the same time preparing for and executing the substantive work of the trial itself.  Doing this with success, as I did, was exceptionally time-consuming.

35. I note that the intensity of the litigation in these cases came at great personal cost, as well.  The volume of paper discovery quickly overflowed from the small office that I was sharing with Reza Rezvani, which led to us being evicted from our office space.  Additionally, for months on end, these cases consumed all of my time, leaving no time for any other matter and leaving me no time to grow my practice or earn any money.

36. Moreover, under the Amended Civil Case Management Plan (see Docket Entry # 34), summary judgment motions were required to be filed on December 4, 2009, responses by December 18, 2009, and any reply by January 7, 2009.  As it happened, my second daughter was

born on December 8, 2009. While I fortunately was present for her birth, needless to say, much of the time surrounding my daughter's birth was instead spent in this litigation.

37. Ultimately, the summary judgment filing date was adjourned to allow for plaintiffs to depose four of the defendant officials. Under that revised schedule, summary judgment motions were required to be filed on March 31, 2010, with responses due three weeks later on April 21, 2010. Unfortunately, my mother-in-law succumbed to cancer on March 27, 2010, and so, as it was with the birth of my second daughter, during the very difficult days and weeks surrounding my mother-in-law's death, much of my time and attention was required to be in this litigation instead of with my family.

38. As documented herein, I spent a combined total of 2,724.9 hours litigating these consolidated actions (see Exh. B). My hourly rate of $550 per hour is supported the Declaration of Myron Beldock, annexed hereto as **Exhibit "D"**, the Declaration of Matthew D. Brinckerhoff, annexed hereto as **Exhibit "E"**, the Declaration of Edward Sivin, annexed hereto as **Exhibit "F"**, and the Declaration of Glenn Miller, annexed hereto as **Exhibit "G"**.

39. Accordingly, while my full lodestar is $1,498,695.00, I am voluntarily reducing that by 15% in the exercise of billing judgment. Therefore, I respectfully submit that this Court should award **$1,273,890.80** for the work done by me in this matter.[10]

40. Despite being out-resourced every step of the way, and despite great personal and financial expense, my co-counsel and I worked unflaggingly on this case, over many years, developed it exceptionally well, and pressed it diligently without compromise. I respectfully submit that any reduction in our fees beyond the 15% that we are voluntarily reducing in the

---

[10] In addition to the fees and costs accrued to date, plaintiffs will supplement their request for fees and costs to reflect all work done on this fee and cost application along with the submission of their

exercise of billing judgment would be unjust and contrary to the principles underlying 42 U.S.C. § 1988.

Dated: New York, New York
       September 30, 2013

                                      Respectfully Submitted,

                                            /S/
                                      AMEER BENNO

---

reply papers, once the amount of work expended on this matter is completed.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of September, 2013, I filed the foregoing DECLARATION OF AMEER BENNO WITH EXHIBITS electronically through the district court's CM/ECF system, which caused the following parties and counsel to be served by electronic means, as reflected on the Notice of Electronic Filing generated by the CM/ECF system:

    Office of New York State Attorney General
    Assistant Attorney General Barbara Hathaway
    Assistant Attorney General Rebecca Durden
    Assistant Attorney General Michael Albanese
    Assistant Attorney General Jason Buskin
    Attorneys for all Defendants other than Defendant Pataki

    Chadbourne & Parke LLP
    Abbe David Lowell
    Christopher D. Man
    Seth Michael Kruglak
    Benjamin David Bleiberg
    Attorneys for Defendant Pataki

                                    /S/
                                   Ameer Benno