IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| KENNETH BAILEY, | 08-Civ-8563 (JSR) |
| CHARLES BROOKS, | 08-Civ-8665 (JSR) |
| SYLVIA TORRES, as Administratrix of the Estate of | |
| Jorge Burgos, Jr., | 08-Civ-8924 (JSR) |
| LOUIS MASSEI, | 08-Civ-8923 (JSR) |
| ROBERT TROCCHIO, | 08-Civ-8925 (JSR) |
| ROBERT WARREN, | 08-Civ-9609 (JSR) |

PLAINTIFFS

vs

GEORGE PATAKI, et al.,

DEFENDANTS

---

DECLARATION OF JEFFREY A. ROTHMAN IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES AND OTHER DISCRETIONARY
COSTS PURSUANT TO 42 U.S.C. § 1988 AND FED.R.CIV.P. 54(d)(2)

JEFFREY A. ROTHMAN, declares, pursuant to 28 U.S.C. § 1746 and under

penalty of perjury, as follows:

1.    I, along with other members of our litigation team, represent the plaintiffs

in these six consolidated actions.  As such, I am familiar with the facts and circumstances

concerning the prosecution of this action.  I respectfully submit this declaration in support

of plaintiffs' application, pursuant to 42 U.S.C. § 1988 and Fed.R.Civ.P. 54(d), for an

order awarding plaintiffs attorneys' fees and costs as the prevailing party in this litigation.

2.    I first came on board to assist with this case in July of 2009, following the

denial of Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).  At that point

the case was being handled solely by Ameer Benno, who had been working on it as well

when the case was with the firm of Shandell, Blitz, Blitz & Ashley, LLP, which dissolved

at the end of June 2009.  Recognizing the large amount of work necessary to litigate this

complex and important case, Mr. Benno assembled a team of attorneys to work on the

case with him.

       3.     At that point - because of the significant expertise I have developed in the

field of constitutional litigation, and my willingness to take on difficult cases that serve to

vindicate important constitutional principles - I was recruited to join the team.  I was

willing to come on board and devote large amounts of work to this case despite

recognizing its obvious risks: e.g., the complexity and novelty of many of the legal issues

involved; the ever-present risk of qualified immunity (magnified in this case by the fact

that all the defendants were employees of New York State, and so there could be no

Monell municipal policy and practice liability due to the 11th Amendment) in this type of

litigation; and, of course, the status of our clients, who had all been convicted of very

serious sexual felonies.

       4.     Despite these risks, I was happy and proud to come on board and lend my

efforts to this righteous cause.  A terrible perversion of the law and fundamental

principles of due process had been committed here, and it was important to obtain a

judicial determination that what had happened to these men was in violation of clearly

established constitutional law.  We also hoped to obtain for these men a monetary

recovery to compensate them for the years of their liberty that were unjustifiably taken

from them.  After years of hard-fought and difficult litigation - including a motion to

2

dismiss on the pleadings, voluminous discovery and summary judgment practice, an

interlocutory appeal, and a long trial - we have been able to prevail as to the first goal, but

not as to the second (as to which we have filed a Notice of Appeal). While we are

certainly disappointed that we were unable to obtain a monetary recovery for our clients

at trial, we have obtained a significant finding of liability against defendant Carpinello - a

high-level government official - and have vindicated vital constitutional principles that

will serve to protect the public (especially vulnerable and despised members of the

public, such as the plaintiffs herein) going forward. The litigation of this case has

generated important published decisions by this Court and by the Second Circuit that

have served the public interest, and upheld the rule of law under novel circumstances.

     5.     All of the work done on this case was part of a common core of facts, and

intermingled throughout plaintiffs' counsels' vigorous and diligent efforts to achieve both

liability and damages, and thus we respectfully submit that we are deserving of a full fee

award for all of the work expended on this litigation. In the exercise of billing judgment,

however, plaintiffs' counsel are voluntarily reducing their fees across the board by 15%.

To the extent that opposing counsel will argue that some of our work is only attributable

to unsuccessful claims or damages issues (which, as discussed in the memorandum of law

submitted with the instant fee application, is not an appropriate analysis, as all the work

done in this case arose from a common core of facts, and was reasonably calculated at the

time it was engaged in to achieving both liability and damages), this significant voluntary

cut to our fees would more than encompass any such time spent, or any time that the Court may consider to have been unnecessarily duplicative.

6.    Plaintiffs' counsel attempted throughout the course of the litigation to avoid unnecessarily redundant work, but some overlap was of course necessary and, indeed, advantageous.  The Attorney General's office throughout the litigation (and, shortly before and during the trial of this action, the Chadbourne firm as well) threw tremendous resources into defending this case, and it was necessary for us to put more than one lawyer (as often did opposing counsel) on, for example, important depositions and motion practice, in order to meet the challenges presented to us.  We were out-resourced at every stage of the case, but still were able to achieve multiple interim victories along the way, and to ultimately prevail following trial.  It was also important that the various members of our team be apprised of the issues and developments that affected the litigation of the case, as the case proceeded.  It was also necessary for us to exchange drafts of documents, and to collaboratively edit each others' work, which enabled us to be up to speed on the essential issues and developments in the case, and to create an optimal final product.

7.    The Declarations of my co-counsel, which are respectfully incorporated herein by reference, also set forth a description of our work together on this case, and the efforts made by our team over these past years to achieve victory.

## ATTORNEY BACKGROUND AND EXPERIENCE

8.      I am a solo practitioner, concentrating in the area of civil rights litigation. My office is located at 315 Broadway, Suite 200, New York, NY 10007. I have operated my own solo civil rights practice since 2004. Prior to that I worked for a year in New York City for Michael Spiegel, Esq., also doing primarily civil rights litigation, and criminal defense work. Prior to that I worked for the Defender Association of Philadelphia, representing indigent defendants in criminal cases. I graduated from the University of Pennsylvania Law School in 2001, where I was a research assistant for Professor David Rudovsky, one of leading civil rights practitioners in the country and a co-author of Michael Avery, David Rudovsky & Karen Blum, *Police Misconduct: Law & Litigation*, one of the leading treatises in the field. During my second summer of law school, in 2000, I worked as a summer associate for the Law Office of Ronald L. Kuby, assisting primarily with police misconduct matters. *See*, Declaration of Ronald L. Kuby, Esq., annexed hereto as **Exhibit A.**

9.      I am a member of the bars of the State of New York, the State of Pennsylvania (inactive status), the United States District Courts for the Southern, Eastern, and Northern Districts of New York, and the United States Court of Appeals for the Second Circuit.

10.      I am or have been counsel for the plaintiff or plaintiffs in 112 civil rights cases in this district. When potential plaintiffs come to me with civil rights matters

raising complex issues or difficult facts that would deter many lawyers from accepting

the case, but where I believe that there has been a deprivation of rights in need of redress,

I will in many circumstances take the case where other lawyers might decline.  This has

led me to become involved in governmental misconduct cases involving significant

complexity, through which I have developed considerable sophistication and skill in the

field of civil rights litigation.  A decision in one of my cases, <u>Forbes v. City of New</u>

<u>York, et al.</u>, 05 Civ. 7331 (NRB), 2008 WL 3539936 (2008), addressing the issue of state

action by private parties, was discussed in the New York Law Journal as one of two

significant, then-recent cases that "illustrate a significant option for enforcing

constitutional rights against nongovernmental actors."  *Applying Constitutional*

*Obligations To Private Actors*, by Christopher Dunn, Esq., 4/28/2009 N.Y.L.J. at page 3

(2009).  That action settled on confidential terms.

       11.     I have been one of the lead attorneys in the ongoing complex consolidated

litigation stemming from the mass arrests by the NYPD during the 2004 Republican

National Convention (RNC), that has generated a number of important decisions in the

police misconduct field, and which web of related and consolidated cases remain pending

before Judge Sullivan and Magistrate Judge Francis.  *See, e.g.*, <u>Dinler v. City of New</u>

<u>York, et al.</u>, 2012 U.S.Dist.Lexis 141851 (denying City's motion for summary judgment

as to one mass arrest location, and granting Plaintiffs' motion for summary judgment as

to another mass arrest location).  The City's interlocutory appeal on the basis of qualified

immunity in the RNC litigation is pending.  *See also*, the Declaration of James I.

Meyerson, annexed hereto as **Exhibit B**, and the Declaration of Jonathan Moore, annexed

hereto as **Exhibit C**.

12.     Over the past number of years I also heavily litigated, as lead counsel, a

putative class action against the New York State Division of Parole (DOP) and the New

York State Department of Correctional Services (DOCS) on behalf of a putative class of

returned parole violators whose concurrent sentences were unconstitutionally transformed

into consecutive sentences, resulting in their being held past their lawful maximum

expiration dates in prison.  That action has generated two important decisions holding

that DOP's and DOCS' policies and practices violated the constitutional rights of

thousands of returned parole violators.  *See, e.g.*, Sudler v. Goord / Batthany v. Horn,

2010 WL 4273277 (S.D.N.Y. October 6, 2010)(Peck, M.J.); *See also*, Sudler v. Goord /

Batthany v. Horn, 2011 WL 691239 (S.D.N.Y. February 23, 2011)(Daniels, J.).

Unfortunately, it was also held that because the law was not clearly established at the

time the violations of the constitution occurred, the individual defendants were shielded

from liability by the doctrine of qualified immunity.  The Second Circuit (Your Honor

was on the panel, sitting by designation) upheld the qualified immunity holding – *see*,

Sudler v. City of New York, 689 F.3d 159 (2d Cir. 2012) - and the United States

Supreme Court declined to grant certiorari.  Those matters are presently still being

litigated before the New York State Court of Claims.  *See also*, the Declaration of

Matthew D. Brinkerhoff, Esq., annexed hereto as **Exhibit D**.  These cases illustrate the

particular risks that are present in civil rights litigation - like the instant litigation - where

the rights violations are committed by employees of a State, which is shielded from

liability under the 11th Amendment, as opposed to a municipality, which can be held directly liable under the <u>Monell</u> doctrine if its policies and practices caused a constitutional violation to occur.  The combination of the qualified immunity defense and the 11th Amendment make civil rights cases such as this one especially risky and difficult endeavors.  When the plaintiffs are unsympathetic – as they were in this case, to put it lightly – the risk is heightened even further.

      13.    Because many civil rights cases also have political implications, they are also often defended vigorously by government attorneys, as was the instant case.  In *Bradley v. City of New York*, 04 Civ. 8411 (RWS), a case arising out of the arrest of a protestor at a 2003 anti-Iraq war protest, it was necessary for my co-counsel, James I. Meyerson, and myself to try the case three times, in addition to fending off an interlocutory qualified immunity appeal to the Circuit.  The <u>Bradley</u> litigation generated multiple reported decisions, culminating in the securing of judgment as to liability as a matter of law in Plaintiff's favor.  *See*, *Bradley v. City of New York*, 2009 U.S.Dist.LEXIS 37664 (S.D.N.Y. 2009)(Sweet, J.).  Following victory in the Circuit on the interlocutory qualified immunity appeal, we were able to obtain at the damages trial an amount in excess of the amount offered by the Defendant City in its Rule 68 Offer of Judgment.  The Plaintiff was awarded $20,000.00 and, in an eventual settlement of the fees and costs, Mr. Meyerson and I received the sum of $740,000.  *See*, the Declaration of James I. Meyerson, Esq., annexed hereto as **Exhibit B.**

      14.    In a number of the civil rights cases in which I have co-counsel (including some who have practiced for decades), I am lead counsel.  In these matters, my colleagues entrust me to serve as lead counsel because they know that I have attained

considerable skill and experience in the field of governmental misconduct litigation, and

that I approach these matters zealously and diligently. *See*, e.g., the Declarations of

Ronald Kuby, Esq. and Matthew D. Brinkerhoff, Esq., annexed hereto as **Exhibits A and**

**D**, respectively.

      15.    Civil rights cases are all inherently risky endeavors, and involve arcane

issues of law. "Congress recognized that civil rights litigation is a specialized and

complex field.  For this reason, the amount of the fees awarded in a civil rights case

should be governed by 'the same standards which prevail in other types of equally

complex federal litigation, such as antitrust cases'."    Michael Avery, David Rudovsky &

Karen Blum, *Police Misconduct: Law & Litigation*, § 14:7 (3d ed.), quoting S. Rep. 6.

      16.    As a result of this specialization, and the expertise I have developed in this

field, I am routinely contacted by my colleagues seeking advice on how to prosecute civil

rights cases.  I am an active member of the National Police Accountability Project

(NPAP), an organization of over 400 plaintiffs' attorneys across the country who work on

police misconduct and other civil rights cases, and which provides training and support

for attorneys and other legal workers, as well as public education and information on

issues related to police misconduct and accountability.  I have been a presenter at two

Continuing Legal Education (CLE) programs sponsored by NPAP: on January 21, 2011, I

was a presenter at an NPAP CLE as part of a panel presentation entitled "The Public as

'Client' in Police Misconduct Litigation," and I again presented at NPAP's CLE held on

June 29, 2012, on the topic "Discovery Issues, including Electronic Discovery and

Protective Orders."

17.     I am also a member of the Advisory Board of the New York City Policing Roundtable (NYCPR), a non-profit organization of over 70 members that nurtures relationships between civil rights and public interest attorneys, community organizers, advocates, policy analysts, academics, and others who work to end police misconduct in New York City, and which provides legal training and technical support, and advocates for systemic reforms.

18.     The people I represent in civil rights cases cannot afford the services of a lawyer on an hourly basis.  Almost none can make more than a small contribution to litigation expenses.  I take civil rights cases on a contingency basis, and I am compensated based on a portion of any judgment or settlement, or through the payment of fees by the defendants.

19.     Because the inherent risk in any civil rights case is high, and because of the risk that any civil rights case can become protracted with multiple, time and expense consuming layers of substantive and procedural complexity, civil rights lawyers like myself depend on the availability of a lodestar recovery in the event that we do prevail.

## HOURS EXPENDED AND APPLICABLE RATE

20.     I have to the date of the filing of the instant fee application spent 776.5 hours of work on this matter[1].  At my hourly rate of $550 per hour, my lodestar is $427,075.  *See*, the undersigned's time sheets, annexed hereto as **Exhibit E.** Discounted by 15% in the exercise of billing judgment, my discounted lodestar is $363,013.75.  My

---

[1] There are also, I am certain, a significant number of additional hours that I simply did not log in the midst of busy days, and a significant amount of time that I spent on the case during time that I was away with my family, that also was not logged, and for which I am not seeking compensation.

co-counsels' respective time sheets, and our out-of-pocket costs, are annexed to their respective declarations accompanying the instant application.

21.     Plaintiffs' counsel should therefore be awarded our full requested fee by this Court.  My co-counsel and I worked exceedingly hard on this case, over many years, and developed it well and pressed it diligently and skillfully.  Any reduction in hours beyond the 15% that we are voluntarily reducing from our lodestar in the exercise of billing judgment would be unjust and contrary to the principles underlying 42 U.S.C. § 1988.

22.     As referenced above, annexed hereto in support of my hourly rate are the Declaration of Ronald L. Kuby, annexed hereto as **Exhibit A**, the Declaration of James I. Meyerson, annexed hereto as **Exhibit B**, the Declaration of Jonathan Moore, annexed hereto as **Exhibit C**, and the Declaration of Matthew D. Brinckerhoff, annexed hereto as **Exhibit D**.

23.     In further support of our rates, annexed hereto as **Exhibit F** please find the 2012 National Law Journal published survey of prevailing market rates for attorneys. The survey demonstrates that $550 per hour is well within the range of "prevailing market rates in the relevant community," Perdue v. Kenny A., 130 S. Ct. 1662, 1672 (2010) (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984)).  The "relevant community" in this case is the Southern District of New York[2].  The New York firms listed break

---

[2] Also of relevance, annexed hereto as **Exhibit G** is a printout of the "Laffey Matrix" (www.laffeymatrix.com), which is an accepted tool for establishing hourly rates for attorneys in the Washington, D.C.-Baltimore area. *See, e.g.*, Interfaith Comm'ty Org. v. Honeywell, 426 F.3d 694, 708-709 (3d Cir. 2005).  The Laffey Matrix lists the following current rates: $175 per hour for paralegals; $320 per hour for lawyers 1-3 years out of law school; $393 per hour for lawyers 4-7 years out of law school; $567

down as follows: DLA Piper partners billed within the range of $550-$1200 per hour,

with the median $775 per hour, and associates billed within the range $335-$760, with

the median $530 per hour; Epstein, Becker & Green partners billed within the range of

$330-$750 per hour, with the median $535 per hour, and associates billed within the

range $215-$455 per hour, with the median $330 per hour; Kelley Drye & Warren

partners billed within the range of $450-$950 per hour, with the median $660 per hour,

and associates billed within the range $285-$600 per hour, with the median $450 per

hour; Shulte Roth & Zabel partners billed within the range of $785-$995 per hour, with

the median $895 per hour, and associates billed within the range $295-$705 per hour,

with the median $585 per hour.  The National Law Journal survey does not cover all law

firms, and it is well known among attorneys at law firms in New York that many of the

firms with the highest rates do not respond to the survey[3].

    24.    As I am a solo practitioner and often act as lead counsel, and take on

myself the economic risk (in terms of the expenditure of both time and money) of civil

rights cases, compared against these significantly higher rates enumerated above, my

rates are certainly within a reasonable range of rates for lawyers of like skill and

---

per hour for lawyers 8-10 years out of law school; $640 per hour for lawyers (such as myself) 11-19 years out of law school; and $771 per hour for lawyers with 20-plus years out of law school.

[3] It has been reported in the New York Daily News politics blog (viewable at http://www.nydailynews.com/blogs/dailypolitics/2013/08/lawsuit-against-ex-gov-george-pataki-will-cost-taxpayers-up-to-525-an-hour-in-) that the New York State Attorney General's office has agreed to pay the attorneys from Chadbourne & Parke at the rate of $525 per hour for partners, $400 an hour for associates, and $125 per hour for paralegals, for their defense of Governor Pataki in this case. *See*, August 5, 2013 blog entry by Daily News reporter Ken Lovett, "Lawsuit Against Ex-Gov. George Pataki Will Cost Taxpayers Up To $525 An Hour In Legal Fees," annexed hereto as **Exhibit H**.

experience.  Your Honor in 2008 noted, with reference to the then-current National Law

Journal survey of rates, and to the experience garnered by solo practitioners, as follows:

> As to attorney's fees, defendants contend, *first,* that the billing rate of
> plaintiff's attorney, *i.e.*, $350/hour, exceeds the market rates "prevailing in
> the community for similar services by lawyers of reasonably comparable
> skill, experience, and reputation." <u>Gierlinger v. Gleason</u>, 160 F.3d 858,
> 882 (2d Cir.1998) (internal quotation marks omitted). They argue instead
> that the proper rate should be, at most, $200/hour because plaintiff's
> counsel, having been admitted to the bar just five years ago, is comparable
> to a mid-level associate in a large law firm. However, this analysis ignores
> the considerable experience plaintiff's counsel has acquired as a solo
> practitioner, working primarily in the areas of wage and hour litigation
> over the past five years. Further, even assuming, *arguendo,* that
> defendants' comparison were here appropriate, a number of large New
> York firms bill the time of their fifth-year associates at between $300-
> $400/hour. *See* Billing Rates for Junior and Senior Associates, *The
> National Law Journal* (Dec.2004), *at* http://
> www.law.com/jsp/article.jsp?id=1102340171889. Accordingly, the Court
> finds the rate requested by plaintiff's counsel to be fully reasonable for
> counsel of his skill and experience.

<u>Barfield v. New York City Health and Hospitals Corp.</u>, 2006 U.S. Dist. LEXIS 56711

at *1-2 (S.D.N.Y.) (Rakoff, J.), affirmed 537 F.3d 132, 139 (2nd Cir. 2008).

      25.   I have settled the matter of attorneys' fees and costs with defendants in all

but one of my cases.  By Report and Recommendation dated March 9, 2010 it was

determined by Magistrate Judge Dolinger that my work done in calendar year 2009 be

compensated at the rate of $350 per hour (when my rate was actually $400 per hour).

That rate was endorsed by Judge Victor Marrero in his Decision and Order dated March

25, 2010.  *See*, <u>Tucker v. City of New York, et al.</u>, 704 F.Supp.2d 347, 361 (S.D.N.Y.

2010).  On January 1, 2011 I raised my rate from $400 to $475 per hour, and it remained

at that rate until January 1, 2013, when I raised it again to $550 per hour.

26.     I (and my co-counsel) have billed for all of our time spent over the course of this protracted litigation at our current respective rates.  *See,* LeBlanc-Steinberg v. Fletcher, 143 F.3d 748, 764 (2d Cir. 1998) ("Current rates, rather than historical rates, should be applied in order to compensate for the delay in payment."); Rozell v. Ross-Holst, 576 F. Supp.2d 527, 545 (S.D.N.Y. 2008)(Francis, M.J.) ("current rather than historic rates should be utilized to account for the delay between the date services were rendered and when fees can be recovered").

27.     In addition to the fees and costs accrued to date, Plaintiffs will supplement their request for fees and costs to reflect all work done on this fee and cost application along with the submission of their reply papers, once the amount of work expended on this matter is completed.

Dated:       New York, New York
             September 30, 2013

                                            AN, Esq.
                                            00
                               New York, NY 10007
                               Tel.: 212 - 227 – 2980
                               One of the Attorneys for Plaintiffs